AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
Southern District of California


FILED
APR 27 2018
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY

| | | |
|---|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>Black iphone<br>Model 1A661 FCC ID BCGE-30878 IC:579C E3087A | ) ) ) ) ) ) | Case No. **18MJ2025** |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

Attachment A, incorporated fully herein.

located in the _____Southern_____ District of _____California_____, there is now concealed *(identify the person or describe the property to be seized)*:

Attachment B, incorporated fully herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| Title 21 USC 841(a)(1), 846 | Conspiracy to Distribute Controlled Substances or to Possess with Intent to Distribute |

The application is based on these facts:

See attached affidavit, incorporated fully herein.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Ava Moran, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 4/27/18

_____
*Judge's signature*

City and state: San Diego, CA

Jan M. Adler, United States Magistrate Judge
*Printed name and title*

## AFFIDAVIT IN SUPPORT OF APPLICATION

I, Ava A Moran, being duly sworn, declare and state:

### TRAINING AND EXPERTISE

1. I am an investigative or law enforcement officer within the meaning of Title 18, United States Code, Section 2510(7); that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

2. I am a Special Agent of the Federal Bureau of Investigation ("FBI"), and have been so employed since August 2014. I am currently assigned to the San Diego Field Division, North County Regional Gang Task Force ("NCRGTF"). Prior to joining the FBI, I was a United States Marine Corps Intelligence Officer serving on active duty from August 2009 until September 2013. I have received 21 weeks of training at the FBI Academy in Quantico, Virginia. During that training, I received instruction regarding a wide variety of investigative techniques that are commonly used in support of a wide range of the FBI's investigative priorities. The training included instruction regarding the use of sources, electronic surveillance techniques, law enforcement tactics, search and seizure laws and techniques, surveillance, forensic techniques, interviewing, and a variety of other subjects.

3. During my law enforcement career, I have received formal training in narcotics and gang investigations. I have participated in multiple separate investigations involving the distribution of controlled substances and firearms. As part of these investigations, I have used various investigative techniques, including physical and stationary surveillance, informants and cooperating sources, court authorized interceptions, pen register/trap and trace devices, telephone toll analysis, undercover operations, physical searches, mail covers, and electronic examinations of evidence. In addition to my formal training, I have received on the job training in the manner in which narcotics are packaged, consumed, transported and sold. I have spoken to narcotics officers, drug users, drug dealers, and informants regarding the manner in which narcotics transactions are commonly carried out, how narcotics are packaged for sale, and how drug dealers store, conceal, sell, smuggle, and

transport narcotics. Through previous investigations, I have obtained knowledge regarding the ordinary meaning of controlled substance slang and jargon. I have monitored and reviewed hundreds of recorded telephone calls and text messages pursuant to Title III court orders in narcotics and gang-related investigations, as well as handled confidential sources with access to drug dealers and gang members.

4. Based on my training and experience, I am familiar with how drug traffickers and gang members communicate and operate. For example, I am aware that drug traffickers and gang members frequently discuss criminal activity using cellular telephones and often use coded language to obscure these conversations. I also know that drug traffickers and gang members change phones as a means to evade detection by law enforcement. Moreover, I know that drug traffickers and gang members obtain phones from third parties and or subscribe to them in fictitious names in order to mask the true identity of the individuals using the phones. I am also aware of how drug traffickers and gang members organize and operate their illegal activities, including the use of locations, vehicles, and other resources, in the furtherance of their criminal activities. I am familiar with the typical make up and operation of gangs and drug trafficking organizations, including the distribution, storage, and transportation of the drugs, the collection of money which represents the proceeds of drug trafficking and other criminal activity, and money laundering.

5. The following is based my own investigation, oral and written reports by other law enforcement officers, physical surveillances, interviews, database and public records checks, searches, telephone toll analysis, and other investigation. Since this affidavit is for a limited purpose, I have not included every fact I know about this investigation. I set forth only facts necessary to establish foundation for the requested order. Conversations and discussions below are set forth in substance unless noted. I have included in parentheses or in brackets my explanations of coded or veiled speech, based on my training and experience, as well as my familiarity with the facts of this investigation. Dates and times are approximate.

//

2

## REQUESTED SEARCH WARRANT

6. I submit that the facts contained herein demonstrate probable cause to believe that the fruits, instrumentalities and evidence of violations of Title 21, United States Code, Sections 841(a)(1) and 846 (Conspiracy to Distribute Controlled Substances); Title 21, United States Code, Section 841(a)(1) (Possession of Controlled Substances with intent to Distribute); and Title 21, United States Code, Section 843(b) (Illegal use of a Communication Facility), more fully described in ATTACHMENT B (incorporated herein), will be found in the following item to be searched, as more fully described in ATTACHMENT A (incorporated herein): Black iPhone Model 1A661 FCC ID BCGE-30878 IC:579C E3087A ("**Subject Telephone**"). The **Subject Telephone** was seized on February 28, 2018 by law enforcement officers incident to the arrest of Irma URENA ("URENA") for violations of Title 21, United States Code, Sections 841(a)(1) and 846. The **Subject Telephone** is currently in FBI evidence custody in San Diego, California.

## FACTS ESTABLISHING PROBABLE CAUSE

7. Since early 2017, investigators from NCRGTF have been investigating individuals involved in the heroin distribution ring led by Varrio Carlsbad Locos gang member (VCLS) Robert GONZALEZ, aka "Sleepy" ("GONZALEZ"). The investigation involved the use of a variety of investigative techniques, including wire intercepts, search warrants, phone and vehicle trackers, and pen data. Between June 30, 2017, and October 7, 2017, investigators received authorization to wiretap three of GONZALEZ's phones, as well as two phones belonging to two of GONZALEZ's associates. On February 23, 2018, a grand jury in the Southern District of California returned an indictment charging GONZALEZ and eight of his associates, including URENA, with conspiracy to distribute 100 grams and more of heroin, in violation of Title 21, United States Code, Section 841(a)(1) and 846. *See* 18CR1008-MMA.

8. During the course of the investigation, investigators learned that URENA was purchasing redistributable amounts of heroin from GONZALEZ. URENA was intercepted consistently over one of GONZALEZ's phones during the months of August and September

3

2017. She identified herself as "Irma" in an intercepted message on August 24, 2017, and was thereafter intercepted repeatedly using the same phone number arranging to conduct narcotics transactions with GONZALEZ. For example, on September 9, 2017, at approximately 12:48 p.m., URENA texted GONZALEZ, "Hey whatsup. Can we meet up?" GONZALEZ responded with, "Yea," followed by "Same place" and "Igual as last." URENA replied, "Yes to all. But can u split it in half for me," implying that she was going to re-distribute the heroin. URENA and GONZALEZ then texted back and forth about meeting up in a "parking lot" around 1:30 p.m. At approximately 2:25 p.m., URENA texted GONZALEZ that she was waiting for him by the "99 cents store" and asked if GONZALEZ was still coming. At 2:44 p.m., after being unable to reach or see GONZALEZ, URENA texted, "Sleeps I'm waiting for U k. On the other side of our reg place." URENA then called GONZALEZ at 2:54 p.m. During this call, GONZALEZ told URENA that he was on the "Walmart side" of the parking lot, but URENA told GONZALEZ that she was "by the Subway." GONZALEZ said he would head over to meet URENA. Vehicle tracking data on GONZALEZ's vehicle on September 9, 2017, at approximately 2:48 p.m., depicted the vehicle headed westbound on Civic Center Drive in Oceanside towards the area of the Wal-Mart located at 1046 Mission Avenue in Oceanside. While at the Wal-Mart, the vehicle made stops throughout the parking lot. The vehicle departed the area eastbound on Civic Center Drive at approximately 3:55 p.m. Based on the wire and electronic intercepts, and the vehicle tracking data, it is believed URENA met with GONZALEZ in the Wal-Mart parking lot to conduct a narcotics transaction.

9. Similarly, on September 15, 2017, at 5:23 p.m., URENA texted GONZALEZ, "Hey. Imma call I sometime tomorrow morning. Can U save for me?" GONZALEZ responded at 10:21 p.m. with, "Yea but get atb me before just shoot me a text before 10 to tell d me." The next day, September 16, 2017, GONZALEZ texted URENA at 10:02 a.m., "Let me know when you want to get the job done cause might be going grocery shopping." Twenty minutes later, URENA responded, "Do u think u can come to vista?" Over the next hour, URENA and GONZALEZ coordinated meeting up and URENA asked GONZALEZ to come see her at

4

1  "1510 s melrose" near the "Albertsons on Shadow Ridge" because her car broke down.
2  Notably, URENA's known residential address was 1510 South Melrose Avenue in Vista,
3  California. At 11:16 a.m., GONZALEZ texted URENA, "I'm hear." Vehicle tracking data on
4  GONZALEZ's vehicle on September 16, 2017, depicted that at approximately 11:38 a.m.,
5  GONZALEZ's Chevy truck arrived near 1510 South Melrose Drive in Vista, California.
6  Based on the electronic intercepts and vehicle tracking data, it is believed URENA met with
7  GONZALEZ near 1510 South Melrose Drive to conduct a narcotics transaction.

8      10. On September 26, 2017, at 1:15 p.m., URENA texted GONZALEZ, "Hey can we
9  meet up today at about 415pm??" After not getting a response from GONZALEZ, URENA
10 texted at 4:35 p.m., "Hey Sleeps. I was hoping to meet with you after work today, let me
11 know if u can meet up. Just got off work." GONZALEZ responded, "Ok u want to meet."
12 URENA said, "Yes where," and GONZALEZ responded, "Harbor freight." At 4:38 p.m.,
13 URENA texted GONZALEZ, "Ok I'm on my way." GONZALEZ responded, "I'm b inside so
14 text or call wen you outside." Pole camera footage outside GONZALEZ's residence depicted
15 GONZALEZ departing his residence at 4:48 p.m. in his vehicle. URENA then texted
16 GONZALEZ at 5:09 p.m., "Here." URENA texted again at 5:11 p.m., "Onlu have 3 [$300]
17 today." Vehicle tracking data on GONZALEZ's vehicle at approximately 4:49 p.m. depicted
18 the vehicle headed westbound on Civic Center Drive in Oceanside towards the area of the
19 Harbor Freight located at 316 North Horne Street, Oceanside, California. The vehicle
20 departed the area eastbound on Civic Center Drive at approximately 5:45 p.m. Based on the
21 electronic intercepts, pole camera footage, and vehicle tracking data, it is believed URENA
22 met with GONZALEZ near the Harbor Freight in Oceanside to conduct a narcotics
23 transaction.

24     11. On September 29, 2017, GONZALEZ arranged another narcotics transaction
25 with URENA. At approximately 11:52 a.m., URENA texted GONZALEZ, "Hey sleeps. Can
26 we meet up??" Several minutes later, GONZALEZ replied "Yes," followed by "Come same
27 spot," to which URENA replied "But I'm at work til 4pm. Gonna want the compelte set [a
28 half ounce of heroin] again." GONZALEZ replied, "Ok so 4 [4 grams] plus the 8 tacos [8

5

grams]" and URENA replied, "yup that's correct, see u in a couple hours then." At approximately 4:21 p.m., URENA texted GONZALEZ, "Hey Sleeps. Waiting for u. Gotta get home soon." At approximately 4:25 p.m., surveillance agents observed Santiago MARTINEZ, aka "Tiny,"[1] enter the Harbor Freight parking lot in Oceanside on a bicycle and meet with two unknown individuals on the Walmart side of the lot. At approximately 4:59 p.m., surveillance agents observed a Black Chevrolet Tahoe bearing CA license plate 7JIL759 registered to "Irma Cecilia Urena" arrive at the Harbor Freight parking lot. At approximately 5:15 p.m., GONZALEZ texted URENA, "Ok I'm sen d the lui [Luis CAMPOS] homie on a bike he was just their." URENA then asked GONZALEZ, "Whatcha sending??" GONZALEZ responded, "12 de tacates [12 grams of heroin]," and then asked URENA, "U got all the funds." URENA responded, "I got 440." At approximately 5:25 p.m., GONZALEZ texted URENA, "He's o a white mountain bike it's danny [MARTINEZ] not lui [CAMPOS]" followed by, "he's looking for your taho." At approximately 5:23 p.m., surveillance agents observed MARTINEZ meet with the female driver of the Black Chevrolet Tahoe and conduct a hand-to-hand transaction consistent with a narcotics transaction.

12. Surveillance agents followed the Black Chevrolet Tahoe out of the parking lot and maintained surveillance until Oceanside Police Department (OPD) uniformed officers were able to arrive on scene and conduct a traffic stop in the vicinity of 435 S. Melrose Drive in the city of Vista, California. At approximately 5:45 p.m. OPD officers stopped the Black Chevrolet Tahoe and made contact with the female driver. The driver presented a California Driver's License bearing the name "Irma Urena." OPD Officers instructed URENA to exit the vehicle. Officers did not locate any narcotics inside the vehicle. When confronted about having narcotics in her body, URENA informed officers she had heroin secreted inside her. URENA produced a black tar like substance wrapped in plastic and Officers took the narcotics and released URENA. The black tar like substance tested presumptively positive

---

[1] Santiago MARTINEZ and Luis CAMPOS, discussed *infra*, were identified during the investigation as individuals who delivered narcotics on behalf of GONZALEZ to GONZALEZ's customers. MARTINEZ and CAMPOS were both indicted with GONZALEZ and URENA in 18CR1008-MMA.

for heroin and had a net weight of 11.7grams. During this traffic stop and seizure, Officers did not seize any cellphone from URENA.

13. On February 28, 2018, Carlsbad Police Department Officers arrived at URENA's residence – 1510 South Melrose Drive in Vista, California – to arrest her on the felony arrest warrant for criminal case 18CR1008-MMA. Officers arrested URENA as she was exiting her residence and walking to the parking lot. Incident to arrest, Officers seized the **Subject Telephone** from URENA. Post-arrest, URENA claimed she did not sell heroin; she claimed she only bought heroin from GONZALEZ to support her own addiction.

14. Based on the aforementioned information, I believe URENA utilized a telephone to arrange several narcotics transactions with GONZALEZ. At this time, I do not know if the **Subject Telephone** is the same telephone URENA used to communicate with GONZALEZ that was intercepted on the wiretap on GONZALEZ's telephone. However, based on my experience and training, I believe individuals involved in the purchase and sales of narcotics often utilize multiple telephones and/or change telephones often in order to evade detection by law enforcement. Therefore, I believe there is probable cause to believe that any telephone used by URENA will contain digital evidence of either narcotics sales or purchases, to include the **Subject Telephone**.

**BASIS FOR EVIDENCE SOUGHT IN SEARCH WARRANT**

15. Based upon my experience and training, consultation with other law enforcement officers experienced in drug and financial investigations, and all facts and opinions set forth in this affidavit, I know that:

    a. Individuals involved in drug distribution use cellular telephones and electronic communication devices to conduct their criminal activities. An examination of the **Subject Telephone** will enable investigators to establish further evidence of the drug distribution conspiracy.

    b. Cellular telephones and electronic communication devices (Tablets, I-Pads, etc) are capable of storing many different types of data that are invaluable to investigators and could be evidence of criminal conduct. This data, sought pursuant to the

7

requested search warrant, consists of the contents of the cell phone or electronic communication devices' memory, including: Stored names and telephone numbers in the memory, "phonebook" or list of contacts, and/or speed dial functions of the phones; phone numbers dialed for the most recent outgoing or "sent" calls of the telephones, along with date and time of call data; phone numbers dialing the telephones for the most recent incoming "received" calls, along with date and time of the call data; phone numbers dialing the telephones for the most recent "missed" calls, along with date and time of call data; GPS navigation information; internet searches and websites viewed; and deleted data.

    c.    Drug traffickers commonly use cellular telephones, blackberries, PDAs, electronic communication devices, other personal handheld electronic devices, and laptop and desktop computers to communicate with, among others, their customers, their suppliers, and other criminal associates and to store phone numbers, text messages, emails, photographs, physical and email addresses, and other information that constitutes evidence of their drug trafficking activities. Drug traffickers also commonly store records of the business of distributing and selling drugs, on computers and computer discs, diskettes, cassettes, tapes, and other forms of digital media.

    d.    In addition to their use of computers and digital media, persons involved in narcotics trafficking, often use mobile phones in furtherance of these activities. When used in this manner, the mobile phones typically contain data constituting evidence of these activities. Many current mobile phones are sophisticated computing devices and are capable of performing many of the same functions as computers. They are commonly used in furtherance of illicit activity in the same manner as computers, as detailed above.

## SEARCH PROTOCOL FOR CELLULAR TELEPHONES AND ELECTRONIC COMMUNICATION DEVICES

16. It is not possible to determine, merely by knowing the cellular telephone's make, model and serial number, the nature and types of services to which the device is subscribed and the nature of the data stored on the device. Cellular devices today can be simple cellular telephones and text message devices, can include cameras, can serve as

personal digital assistants and have functions such as calendars and full address books and can be mini-computers allowing for electronic mail services, web services and rudimentary word processing. An increasing number of cellular service providers now allow for their subscribers to access their device over the internet and remotely destroy all of the data contained on the device. For that reason, the device may only be powered in a secure environment or, if possible, started in "flight mode" which disables access to the network. Unlike typical computers, many cellular telephones do not have hard drives or hard drive equivalents and store information in volatile memory within the device or in memory cards inserted into the device. Current technology provides some solutions for acquiring some of the data stored in some cellular telephone models using forensic hardware and software. Even if some of the stored information on the device may be acquired forensically, not all of the data subject to seizure may be so acquired. For devices that are not subject to forensic data acquisition or that have potentially relevant data stored that is not subject to such acquisition, the examiner must inspect the device manually and record the process and the results using digital photography. This process is time and labor intensive and may take weeks or longer.

17. Following the issuance of this warrant, I will collect the **Subject Telephone** and subject it to analysis. All forensic analysis of the data contained within the **Subject Telephone** and its memory cards will employ search protocols directed exclusively to the identification and extraction of data within the scope of this warrant.

18. Based on the foregoing, identifying and extracting data subject to seizure pursuant to this warrant may require a range of data analysis techniques, including manual review, and, consequently, may take weeks or months. The personnel conducting the identification and extraction of data will complete the analysis within ninety (90) days, absent further application to this court.

## CONCLUSION

19. Based upon my experience and training, consultation with other law enforcement officers experienced in drug and financial investigations, and all the facts and

opinions set forth in this affidavit, I believe that probable cause exists to conclude that the **Subject Telephone**, as further described in Attachment A (incorporated herein by reference), was utilized to facilitate the offense of drug distribution. Furthermore, I believe there is probable cause to believe the **Subject Telephone** contains stored data that constitutes evidence, fruits, and instrumentalities of violations of Title 21, United States Code, Sections 841(a)(1) and 846 (Conspiracy to Distribute Controlled Substances).

20. Therefore, I respectfully request a warrant be issued authorizing a search of the item described in Attachment A, and the seizure of items listed in Attachment B, using the methodology described above.

21. I swear the foregoing is true and correct to the best of my knowledge and belief.

Ava Moran, Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me this 27th day of April 2018.

The Honorable Jan M. Adler
United States Magistrate Judge

## ATTACHMENT A

### PROPERTY TO BE SEARCHED

The property to be searched in connection with an investigation of violations of Title 21, United States Code, Sections 841(a)(1) and 846 is described below:

>Black iphone
>Model 1A661 FCC ID BCGE-30878 IC:579C E3087A
>(**Subject Telephone**)

Currently in the possession of the San Diego Federal Bureau of Investigation.

## **ATTACHMENT B**

## ITEMS TO BE SEIZED

Authorization to search the **Subject Telephone** described in Attachment A includes the search of disks, memory cards, deleted data, remnant data, slack space, and temporary or permanent files contained on or in the **Subject Telephone**. The seizure and search of the **Subject Telephone** will be conducted in accordance with the affidavit submitted in support of the warrant, which is incorporated herein.

The evidence to be seized from the **Subject Telephone** will be electronic records, communications, and data, such as emails, text messages, photographs, audio files, videos, and location data, for the period of August 1, 2017, to February 28, 2018:

a. tending to identify attempts to distribute or possess with the intent to distribute heroin or other controlled substances;
b. tending to identify accounts, facilities, storage devices, and/or services–such as email addresses, IP addresses, and phone numbers–used to facilitate the distribution or possession with intent to distribute heroin;
c. tending to identify co-conspirators, criminal associates, or others involved in the distribution or possession with the intent to distribute heroin;
d. tending to identify travel to or presence at locations involved in the distribution or possession with intent to distribute heroin; such as stash houses, load houses, or delivery points;
e. tending to identify the user of, or persons with control over or access to, the **Subject Telephone**; and/or
f. tending to place in context, identify the creator or recipient of, or establish the time of creation or receipt of communications, records, or data involved in the activities described above.

**which are evidence of violations of Title 21, United States Code, Sections 841(a)(1) and 846.**